**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MARK ANDREW BROWN, | ) | Case No. 09-44254 |
| | ) | |
| Debtor. | ) | |

**MEMORANDUM OPINION**

       In this Chapter 7 case, the United States Trustee ("UST") filed a motion asking for the imposition of sanctions and the disgorgement of attorneys fees from an out-of-state law firm that provided bankruptcy-related legal services to the Debtor before the case was filed but did not appear as his counsel in the bankruptcy case. The Court held a trial on the motion on December 15, 2010. At the conclusion of the hearing, the Court orally denied the UST's motion. This Memorandum Opinion provides the detailed basis for that ruling.

**BACKGROUND**

       The scope of the UST's motion and the evidence adduced at the day-long trial suggest that the UST seeks a broad indictment of the Respondents' business model, practices, and procedures. The Court, however, is not inclined to use this case as a vehicle to indict (or endorse) the Respondents' business.[1] The relevant background is therefore limited to those facts necessary to evaluate the Respondents' involvement in this particular case.

<u>Key Parties</u>

1.    Movant is the United States Trustee in and for Region 13, which includes the Western District of Missouri.

2.    Respondent Consumer Law Associates ("CLA") is a Maryland limited liability company formed in 2007. CLA is owned by Neil Ruther and Lisa Perrillo.

---

[1] Indeed, it is the Court's understanding that this case is just one of perhaps several cases around the country in which the regional trustees, at the direction of the Executive Office of the United States Trustee, have attacked the practices of the Respondent, Consumer Law Associates. The Court actually has serious concerns about the Respondents' business model, particularly with regard to an apparent conflict of interest between its debt settlement and bankruptcy practice arms. It would seem that the bankruptcy practice arm has an interest in a client failing the debt settlement process, which failure would result in an early termination penalty and create additional attorneys fees. However, the Court declines to venture into these areas, particularly under the facts of this case.

3. Persels & Associates, LLC ("Persels") is a Maryland limited liability company also owned by Ruther and Perrillo. (CLA and Persels are referred herein collectively as "Law Firms.")

4. At all relevant times, Kara Plunkett was an attorney admitted to the Florida bar, residing in Nolensville, Tennessee, and engaged by the Law Firms pursuant to an Independent Contractor Agreement.

5. At all relevant times, William Grafton was an attorney admitted to practice law in Mississippi and Texas. Grafton was employed by the Law Firms as the manager of their bankruptcy practice divisions.

6. At all relevant times, Mandy Shell was an attorney admitted to the Missouri bar and the United States District Court for the Western District of Missouri. Since April 6, 2009, Shell has been working for the Law Firms pursuant to an "Independent Contractor Agreement," in addition to maintaining her own private law practice.

7. Mark Brown is the debtor in the above-captioned case. He resided in Missouri at the time he filed his Chapter 7 bankruptcy petition,.

The Respondents' Representation of Brown

On or about September 3, 2008, the Debtor (then a resident of Kansas) entered into a debt settlement program with Persels & Associates through Care One, an affiliated debt settlement company. After paying approximately $415 to fund potential settlements with creditors, Brown decided he could not complete the debt settlement program and consulted Persels about filing bankruptcy. Persels referred Brown to CLA.[2]

On or about October 27, 2008, Harold Stafford, an attorney affiliated with the Law Firms, discussed with Brown whether a Chapter 7 bankruptcy was a viable option. Stafford was a member of the Wisconsin bar; he was not admitted to practice law in either Missouri or the Western District of Missouri. As a result of that discussion, on November 7, 2008, Brown signed a bankruptcy retainer agreement with CLA in which CLA agreed to file a Chapter 7 case on his behalf in exchange for a flat fee of $1,998 - legal fees of $1,499, the Chapter 7 filing fee of $299, and $200

---

[2] Apparently, Persels now handles all of the bankruptcy matters and CLA provides the debt settlement services.

in estimated costs – which Brown paid on or about December 3, 2008.[3]

On November 10, 2008, CLA sent Brown a questionnaire and a list of documents necessary to prepare a draft of his bankruptcy papers. As would prove to be Brown's habit in the case, his response was late and incomplete. On or around January 6, 2009, a paralegal prepared the first draft of certain bankruptcy papers and left a message for Brown seeking additional documents. Brown did not respond until March 1, 2009, when he submitted some, but not all, of the documents CLA requested.

On March 3, 2009, Plunkett, the "audit attorney" assigned to Brown's case, conducted a bankruptcy "audit" with Brown by telephone. The parties stipulated that Brown's audit was substantially similar to those routinely conducted by CLA, which include a general review of a debtor's case and schedules and a discussion of the debtor's intent with regard to the surrender of property and reaffirmation of debts. Audits (including Brown's, presumably) also provide a debtor a basic overview of exemptions and an explanation that a "filing attorney" will make an independent assessment of his case, including an evaluation of relevant state law issues, and, if the client makes the final decision to go forward, file the case, attend the § 341 meeting with the debtor, and perform any of the necessary services described in the engagement letter. In the course of Brown's audit, Plunkett asked Brown to send additional documents necessary to file his case. On March 25, 2009, Brown faxed additional documents to CLA.

On April 6, 2009, Shell signed an "Independent Contractor and Indemnification Agreement" with CLA, Persels, and other affiliates and commenced working for them.

For the next four months, CLA contacted Brown repeatedly to obtain additional information necessary to file his bankruptcy petition.[4] Brown submitted the last documents necessary to file his petition on or around August 10, 2009.

---

[3] As discussed below, the Respondents' fees in this case will be limited to $1,848, the amount stated in the Rule 2016 disclosure of compensation.

[4] On April 28, 2009, Brown called CLA for a status update. On April 29, 2009, Plunkett unsuccessfully attempted to reach Brown by phone and emailed him revised draft bankruptcy papers. Brown responded to the email and provided corrections. On May 4, 2009, Plunkett again tried unsuccessfully to contact Brown by phone about missing information. On June 16, 2009, CLA made a follow-up attempt to contact Brown. On June 23, 2009, Brown confirmed he had received CLA's June message and would call back once he had the requested information. On July 7, 2009, Brown called CLA seeking a status update and was told CLA still needed certain YTD gross income and pay stubs through June, 2009.

On August 21, 2009, Brown was finally given Shell's contact information. Shell met with Brown for approximately three hours to update and correct the draft papers that had been prepared by the CLA employees, and on September 1, 2009, she filed Brown's bankruptcy petition and schedules. The case proceeded without incident or objections and Brown received his discharge on December 10, 2009.

**DISCUSSION**

The UST seeks the disgorgement of fees and imposition of sanctions against the Respondents on three grounds. She contends that the Respondents are not entitled to any legal fees because their involvement in the Debtor's case constituted the unauthorized practice of law; that the Respondents' fees were unreasonable; and that the Respondents should have filed a separate Rule 2016 disclosure of compensation because the one filed by the local, "filing" attorney, Mandy Shell, inadequately disclosed the Respondents' fees and involvement in the case.

**A.    Unauthorized Practice of Law**

To answer the question of whether the Respondents' involvement in the Debtor's case constituted the unauthorized practice of law, the Court must determine (a) whether the Respondents were, indeed, practicing law, and if so, (b) whether that practice of law violated the applicable law and court rules. On the first point, although the Respondents' expert, Professor Charles Wolfram, opined that their involvement in the case was "barely" the practice of law, practicing law is akin to pregnancy – it cannot be practiced in degrees. And the Respondents were most certainly practicing law when they conducted their pre-filing consultations with Brown.[5]

Turning then to the applicable law, the UST argued that the Respondents engaged in the unauthorized practice of law as a matter of federal and state law. The applicable state law

---

[5] See, e.g., *In re Grimes*, 115 B.R. 639, 643 (Bankr.D.S.D.1990) (solicitation of financial information and preparation of schedules is rendering legal advice, whether provided by lay persons or lawyers); *O'Connell v. David*, 35 B.R. 141, 143 (Bankr. E.D. Pa.1983) aff'd, 740 F.2d 958 (3rd Cir.1984) (actual preparation and direct or indirect filing for the debtor of chapter 7 petition and schedules constitutes the unauthorized practice of law); *In re Herren*, 138 B.R. 989, 994 (Bankr. D. Wyo.1992) (entity that provided copies of official forms to debtor, provided directions to complete the forms, and summarized and reformulated information solicited from debtor, was engaged in the unauthorized practice of law).

requirements for practicing law in this Court are more exacting that the federal requirements so the Court discusses those first.

### 1. The Respondents' involvement in the Debtor's bankruptcy case did not violate Missouri Rule of Professional Conduct 4-5.5(c)(1).

The Respondents contend that their activities were permissible under Missouri Rule of Professional Conduct 4-5.5(c)(1) or (2). The UST vigorously disagrees.

Rule 4-5.5 provides in pertinent part:

(a) A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction or assist another in doing so.

(b) A lawyer who is not admitted to practice in this jurisdiction shall not:
    (1) except as authorized by this Rule 4 or other law, establish an office or other systematic and continuous presence in this jurisdiction for the practice of law; or
    (2) hold out to the public or otherwise represent that the lawyer is admitted to practice law in this jurisdiction.

(c) A lawyer admitted and authorized to practice law in another United States jurisdiction and not disbarred or suspended from practice in any jurisdiction may provide legal services on a temporary basis in this jurisdiction that:
    (1) are undertaken in association with a lawyer who is admitted to practice in this jurisdiction and who actively participates in the matter;
    (2) are in or reasonably related to a pending or potential proceeding before a tribunal in this or another jurisdiction if the lawyer or a person the lawyer is assisting is authorized by law or order to appear in such proceeding or reasonably expects to be so authorized . . .

Putting aside, for a moment, that the Respondents' involvement in this case would have been authorized under Rule 4-5.5(c)(2) if they had sought admission *pro hac vice* at the commencement of the case (a status the Court has the discretion to grant *nunc pro tunc*),[6] the Court can find – without engaging in procedural gymnastics – that the Respondents' practice of law in this case did not violate Rule 4.5.5(c)(1).

The key elements and, not surprisingly, the primary bones of contention with regard to the application of Rule 4-5.5(c)(1) here are (1) whether the legal services Brown received from the

---

[6] *See In re Babies*, 315 B.R. 785, 787 (Bankr. N.D. Ga. 2004).

Respondents were provided "on a temporary basis," and (2) whether Shell actively participated in the case. The Respondents' involvement in the Debtor's case satisfies both of these requirements.

Although the term "temporary" is not defined in Rule 4-5.5(c) or anywhere else in the Missouri Rules of Professional Conduct, the Court is not dealing in shades of gray here, because the Respondents' practice of law in Missouri was temporary under any conceivable notion of the term. The manager of CLA's bankruptcy practice, Grafton, hasn't ever represented a client in Missouri; Plunkett, the attorney who conducted Brown's bankruptcy audit, had conducted only one other audit in Missouri in the eighteen months prior to Brown's case; and in 2009 CLA represented only one other client in Missouri.[7]

The UST's argument is, essentially, that the Respondents' presence in Missouri is not temporary – but rather systematic and continuous – because their business model and aspirations are to expand CLA's presence in Missouri and "file as many cases as they can" here. But neither the language of Rule 4-5.5(c) nor the Court's interpretation of it supports a finding that an attorney's (or law firm's) intentions and capacity to move into a jurisdiction constitute an actual continuous and systematic presence in that jurisdiction. Moreover, Grafton cogently and credibly testified that CLA (or Persels) would hire a "W-2" employee (versus an independent contractor like Shell) in Missouri if their presence here grew to a point where it would no longer be considered temporary.

Thus, the Court concludes that the legal services the Respondents provided Brown were done on a temporary basis for purposes of Rule 4–5-5(c).

Next, the Court finds that Shell actively participated in the case. The UST's primary dispute on this issue is whether Shell's failure to participate *earlier* in the case defeats the Respondents' claim that she actively participated in the case; there is no question that Shell performed substantial work in this case, meeting with Brown for over three hours, making substantive changes to his bankruptcy petition and schedules, and attending the § 341 meeting with him. We find nothing in the rule (or common practice) that requires an attorney's constant participation to meet the active participation requirement. To the contrary, considering the lack of complexity in Brown's case,

---

[7] It was unclear from the evidence whether these numbers included the Brown case, but excluding the Brown case wouldn't affect the Court's analysis or conclusion; the numbers are still minuscule.`

Shell's participation earlier in the case would likely have been unnecessarily duplicative. Moreover, the Court finds nothing unusual in the division of labor between attorneys working on a bankruptcy case – be it a Maryland and Missouri attorney or a Kansas and Missouri attorney, as is likely common in this jurisdiction – where one conducts the initial consultation, a paralegal draws up the petition, and another attorney conducts the final interview, revises and files the petition, and appears in court. If this case had progressed more quickly (*i.e.*, without the delays caused at least in part by Brown), it is likely that the participation "disparity" would have been much less apparent. Shell's wrap-up of the case would have followed on the heels of the Respondents' initial work on the case, and the balance of their active involvement in the case would likely have gone unquestioned.

A final note regarding the UST's allegation of the unauthorized practice of law: The UST and its expert witness went to considerable lengths to distinguish this simple Chapter 7 case from the many complex Chapter 11 cases that are routinely handled in part, at least, by out-of-state counsel in this Court and in other bankruptcy courts around the country. They suggest that the out-of-state attorneys in those cases are not engaged in the unauthorized practice of law because Chapter 11 cases can be filed in any one of numerous jurisdictions, in which the attorneys might or might not be admitted, whereas consumer cases typically can be filed in only one place – the district in which the debtor resides – and the attorney will know from the outset whether he or she is admitted in the district of filing. They also suggest that the unauthorized practice of law is permissible in the larger Chapter 11 cases because the law firms involved in those cases typically are "multi-jurisdictional" law firms to start with. Aside from the fact that the attorneys in the Chapter 11 cases usually seek *pro hac vice* admission promptly after filing the case, the Court fails to see the distinction the UST seeks to draw and, in fact, rejects such a distinction.

The Court recognizes that Chapter 7 debtors are generally not as savvy or financially well off as Chapter 11 debtors (or those acting on behalf of a Chapter 11 debtor), but there is nothing in the Missouri Rules of Professional Conduct or Local Rules of this Court that draws a distinction between these two types of clients, providing an exception for out-of-state attorneys representing Chapter 11 debtors or imposing a stricter standard for attorneys representing poor consumer debtors. State law issues are implicated no less in complex Chapter 11 cases than they are in individual Chapter 7 cases. And, quite frankly, local counsel in Chapter 11 cases often have less involvement in the case than Shell had in this case. In short, the Court does not see anything in the rules or

statutes that condones the unauthorized practice of law by large, multi-state law firms but condemns the unauthorized practice of law by small, consumer law firms.

For the foregoing reasons, the Court finds that the Respondents' practice of law in conjunction with this bankruptcy case did not violate Missouri Rule Professional Conduct 4-5.5(c)(1).

### 2. The Respondents' technical violation of Western District of Missouri Local Rule 83.6(m) does not warrant sanctions or the disgorgement of fees.

The local rule providing sanctions for the unauthorized practice of law – Local Rule 83.6(m) – states that the unauthorized practice of law occurs when a person not admitted to the bar "exercises any of the privileges of a member of this Bar, or . . . pretends to be entitled to so do."[8] According to the UST, the Respondents exercised those privileges when Plunkett, Grafton, and Stafford provided Brown's initial bankruptcy consultations and when CLA prepared drafts of Brown's bankruptcy schedules. The Respondents counter that the privileges to which Local Rule 83.6(m) refers do not include pre-filing participation in the case because compliance with the rule through temporary, "*pro hac vice*," admission is impracticable, if not impossible, before a case is filed. And by the time the case was filed, the Respondents' participation in the case had essentially ended.

The Court appreciates the apparent conundrum posed by the interplay of the two rules – the privileges referred to in Local Rule 83.6(m) include legal services provided in preparation for the filing of a case,[9] yet an attorney cannot apply for admission *pro hac vice* until a case is actually filed. In most cases, this paradox is minimized because the attorney(s) involved in a case's preparation continue to participate in the case subsequent to its filing and the potential unauthorized practice of law is, in a sense, retroactively "blessed" by a prompt *pro hac vice* application.[10] The paradox only appears more acute in this case because the Respondents' participation in the case had essentially ended by the time the case was filed. However, despite the paradox and the apparent futility in filing

---

[8] L.R. 83.6(m).

[9] *See* L.R. 83.5(l) (*pro hac vice* admission required for trial "preparation," as well as for filing and appearing in court).

[10] The UST's expert, Professor Nancy B. Rapoport, a renowned expert on ethics issues, also so opined. *See* Declaration of Nancy B. Rapoport, page 4 n.3.

a *pro hac vice* when the Respondents no longer intended to appear or to file pleadings in this Court, their failure to seek admission *pro hac vice* promptly after the filing of this case resulted in the unauthorized practice of law under the plain language of Local Rule 83.6(m).

This violation of Local Rule 83.6(m), however, does not warrant the disgorgement of fees or sanctions in this particular case.

First, the Court finds the violation technical rather than substantive, in that the Respondents fulfilled (if not exceeded) the substantive requirements for admission *pro hac vice* in the Western District of Missouri, which are set forth in Local Rule 83.5(l):

> Any attorney not a member of this Bar, but who is a member in good standing of the bar of any court of record, may be permitted to appear and participate in a particular case, civil or criminal, under the following conditions:
>
> Any attorney residing outside of this district and admitted to practice before and then in good standing in the United States District Court in the district of residence, may, upon written motion, be permitted by this Court to appear and participate as an attorney in the trial of any action or the hearing of any motion, petition or other proceeding then pending before this Court, *but only if the attorney associates with an active Missouri resident member in good standing of this Bar who shall participate in the preparation and trial of the case or presentation of the matter involved and on whom service of all papers may be made.* An attorney seeking admission to practice pursuant to this provision shall file a Petition for Admission Pro Hac Vice, on a form supplied by the Clerk of Court (set forth on Appendix "A" to this Rule), accompanied by payment of the sum of $50.00.
>
> *. . . Upon compliance with the foregoing and introduction of the visiting attorney to the Court, the sponsoring attorney may be excused from further attendance and the visiting attorney will be permitted to appear for the purpose of the particular case, without enrollment.* After being so excused from attendance, however, the sponsoring attorney shall retain all of the responsibilities of a counsel of record and shall continue to accept service of papers and to serve as a point of contact or communication between the Court and the party represented by the sponsoring attorney.[11]

The key, if not only, substantive requirement for admission *pro hac vice* is that the visiting attorney associate with a member of the Missouri Bar who participates in the case. The Respondents satisfied this requirement. As discussed above, Shell's involvement in this case satisfies Missouri

---

[11] L.R. 83.5(l) (emphasis added).

Rule 4-5.5(c)(1)'s "active participation" requirement; therefore, Local Rule 83.5(l) is necessarily satisfied since it requires only that a local attorney "participate" (without qualification) in the case.

Second, the Court finds credible Grafton's testimony that the decision not to seek *pro hac vice* admission in this case was motivated by a desire to minimize costs and not by a scheme to conceal its involvement in the case. Although the Court finds (below) that the Rule 2016 Disclosure filed in this case contains some deficiencies, it clearly discloses CLA's involvement in the case.

Finally, the fact that the Respondents' participation in the case had concluded by the time the case was filed factors into the Court's determination of an appropriate sanction, even if it doesn't absolve it from its technical violation of Local Rule 83.6(m). The Respondents had ceased providing legal services to the Debtor, and they neither appeared in nor attempted to file any pleadings with the Court. Therefore, the Court believes that the purpose and spirit of Local Rules 83.6(m) and 83.5(l) will be adequately served by the entry of this Memorandum Opinion and a direction that the Respondents seek admission *pro hac vice* in any cases they file (in association with local counsel) in this Court.

**B.      Reasonableness of Attorneys Fees**

CLA charged Brown $1,998 to file his Chapter 7 bankruptcy petition – legal fees of $1,499 (split $949 to CLA and $550 to Shell), $299 for the filing fee, and $200 in estimated costs ($100 of which CLA has already agreed to return to Brown). The UST's objection to CLA's fees flows primarily from its contention that the Respondents were engaged in the unauthorized practice of law. According to the UST, fees generated from the unauthorized practice of law are either *per se* unreasonable or should be treated as bankruptcy petition preparer fees, for which $949 would be unreasonable. The UST also suggests that the fees were unreasonable because the case took so long from the time CLA was engaged to the time the Debtor received his discharge.

Because the Court finds that CLA was not engaged in the unauthorized practice of law, only the delay and the quality of the services offered by the Respondents and Shell remain for the Court's consideration. Based on those criteria, the Court finds that the fees paid to CLA and Shell were reasonable.

With regard to the roughly 10-month delay between the time Brown retained CLA to file his bankruptcy petition and the date it was actually filed, the Debtor conceded, and the evidence

10

supports, that the delay was caused primarily by the Debtor's own failure to timely provide necessary documents to CLA. Once the case was filed, it progressed quickly and without incident, with the Debtor obtaining a discharge in just more than two months.

The clean docket and alacrity with which the Debtor received his discharge also speak to the quality of the Respondents' legal services. Quite frankly, there are lawyers admitted to practice in this jurisdiction who charge the same as or more than CLA did in this case and obtain less favorable results, and their fees are almost never challenged by the UST. An informal survey of Chapter 7 bankruptcy cases filed around the time the Debtor's case was pending indicates that the mean amount of legal fees was approximately $1,250. The $1,499 fees charged by CLA (and Shell) are not so far above the mean to be considered unreasonable, especially when local rules provide for a "no-look" fee of up to $3,000.[12]

For these reasons, the Court finds that the total legal fees charged in this case – $949 paid to the Respondents and $550 paid to Shell – are reasonable and need not be disgorged.

**C.    Adequacy of Shell's Fed. R. Bank. 2016 Disclosure**

The Rule 2016 disclosure of compensation filed by Mandy Shell states:

> I have agreed to share the above-disclosed compensation with a person or persons who are not members or associates of my law firm. A copy of the agreement, together with a list of the names of the people sharing in the compensation is attached. $1,848 escrowed by Consumer Law Associates, LLC; $550 of that sum paid to Mandy M. Shell, Esq. to act as local counsel.

The UST contends that CLA's fees should be disgorged because CLA was required to file a separate disclosure of compensation, inasmuch as § 329(a) requires every attorney representing a debtor to file such a disclosure, and CLA needed to disclose the $350 (or $415 - the evidence is unclear on the exact amount) in debt settlement fees it received from the Debtor. CLA responds that the disclosure was adequate, although admittedly not perfect, because CLA and Shell constitute one firm for purposes of Rule 2016. CLA maintains that the disclosure of its debt settlement fees was unnecessary because they were not received for services rendered in contemplation of the Debtor's bankruptcy.

---

[12] Bankr. W.D. Mo. L.R. 2016-1(D).

Although the Court finds that Shell's Rule 2016 disclosure is technically deficient, it is not so misleading or inaccurate as to warrant the disgorgement of CLA's fees in the amount disclosed, namely $1,848. CLA must and is hereby directed to disgorge any fees received over the $1,848 disclosed, including any fees it received from the Debtor for CLA's or Persels's debt settlement services.

First, the Court flatly rejects the Respondents' contention that only one Rule 2016 Disclosure was necessary because Shell and CLA allegedly constituted one firm for purposes of this case. Although it is true that at the time Shell began her representation of Brown she was working up to 30 hours a week for CLA as a debt counselor, CLA considered Shell an independent contractor, and Shell held herself out and filed Brown's case as an independent attorney.

Perhaps the most telling evidence that CLA considered Shell an independent contractor is that they issued her a Form 1099 at the end of the year, instead of a W-2, the tax form issued to employees. Consistent with this distinction, Grafton testified that he would consider hiring a "W-2" attorney in Missouri if the volume of cases here increased significantly. The Court puts no stock in CLA's contention that the Court should disregard the fact that Brown's case would have been filed under CLA's firm name instead of under the "Law Office of Mandy M. Shell, LLC" but for the inflexibility of the software Shell used to file Brown's bankruptcy petition. Even if the software could have been directed to list CLA as the firm filing the petition and Rule 2016 disclosure, simply filing under CLA's name does not automatically make Shell a part of CLA. In fact, in view of the evidence of their independent relationship, filing under CLA's name would have been a bald misrepresentation of the facts. The software was registered in her name for a reason – she operated her own firm and planned to use the software to file cases to which CLA had no connection.

Second, the Court rejects the Respondents' contention that the fees CLA or Persels received for the debt settlement services are outside of the purview of necessary disclosure under 11 U.S.C. § 329 and Fed. R. Bank. P. 2016. Section 329 requires disclosure of all fees received within a year of the filing "for services rendered or to be rendered in contemplation of or in connection with the case by such attorney." Even if the debt settlement fees were not for services rendered "in contemplation" of Brown's bankruptcy case (although as noted above, the Court harbors serious concerns that a client's bankruptcy may indeed be contemplated from the very inception of the debt settlement relationship), the debt settlement fees were unquestionably paid in connection with

Brown's bankruptcy case.

For these reasons, the Court directs the Respondents to disgorge any and all fees received by CLA or Persels in excess of the $1,848 disclosed on the Rule 2016 Disclosure filed in this case.

## CONCLUSION

Whether to sanction an attorney or order disgorgement of fees is a matter left to the broad discretion of the Court.[13] As discussed above, the Respondents' involvement in this case is not above reproach. They violated Local Rule 83.6(m) by failing to obtain admission *pro hac vice* to this Court, and they should have filed a separate Rule 2016 disclosure of compensation, disclosing the fees received for the Law Firms' debt settlement services, in addition to the bankruptcy legal fees they received from the Debtor. Nevertheless, the Court is not persuaded that any of these deficiencies was egregious enough to warrant disgorgement of the legal fees – which the Court has deemed reasonable – or to warrant sanctions. Therefore, the Court limits its order of disgorgement to the debt settlement fees received by CLA which were not disclosed on the Rule 2016 Disclosure filed in this case. Further, CLA and any of its affiliates involved in any case brought before this Court in the future are directed to seek admission *pro hac vice* and to file a separate Rule 2016 disclosure of compensation.

**ENTERED** this 7th day of February 2011.

/s/ Jerry W. Venters
HONORABLE JERRY W. VENTERS
UNITED STATES BANKRUPTCY JUDGE

A copy of the foregoing was mailed
conventionally or electronically to:
Paul M. Hoffman
Adam E. Miller
Mandy M. Shell

---

[13] *See In re Zepecki*, 277 F.3d 1041, 1045 (8th Cir. 2002)